On August 23, 1995, the Tuscaloosa County Board of Education ("the Board") voted unanimously to cancel the teaching contract of Lonnie M. Morse, a tenured teacher. Morse appealed the cancellation of her contract to the Alabama State Tenure Commission ("the Commission"). On October 19, 1995, the Commission affirmed the Board's cancellation of Morse's contract. On December 13, 1995, Morse petitioned the circuit court for a writ of mandamus, seeking to have the Commission's order set aside and also to be reinstated to her former position with full back pay. The trial court denied the petition on September 3, 1996; Morse appeals.
Morse had been employed by the Board since 1963. She had taught elementary school until 1977, when she was promoted to the central office to serve in a supervisory position. From 1985 to 1986, Morse served as the supervisor of the "Chapter I" program. In 1986, she became the director of "Federal Programs" and served in this capacity until June 1995. Although Morse had held various supervisory positions with the Board, she did not become certified as a supervisor until March 1993.
In February 1995, members of the Chapter I and Federal Programs staff, including Morse, attended a workshop conducted by the State Department of Education. At this workshop, the staff learned of certain directives coming from Washington, D.C., regarding the Chapter I and Federal Programs. One of those directives was the move toward a school-based, or site-based, decision-making concept and the maximization of the amount of money spent on instruction. The result of a move to a school-based *Page 411 
decision-making concept would be less need for a central office staff. The Board had the discretion to abolish the central office staff. Dr. Marcia Burke, the administrative assistant to Dr. Joyce Sellers, the superintendent of the Board, attended a number of informational meetings in order to study and clarify the proposed changes by Washington. In April 1995, Dr. Burke recommended to Dr. Sellers that the Board go to a school-based or site-based program.
On May 16, 1995, Dr. Sellers held a meeting with the central office staff, who would be affected by a move to a school-based program. She told them that the end result was still uncertain, but that they had a right to know that the Board was planning to go to a school-based program in the upcoming year. She further explained that as tenured employees they would be given an opportunity to take a position for which they were certified and qualified in the school system. Dr. Sellers also gave Morse a letter that explained the impending move to a school-based program. The letter stated: "[I]t appears that the current position which you hold at the central office will be abolished." Morse informed Dr. Sellers that she was a tenured supervisor and that she would not go back to teaching in the classroom. The last day of school for teachers for the 1994-1995 school year was May 24.
Dr. Sellers's investigation into the move toward a school-based program revealed that the elimination of the central office staff and adoption to a school-based program would create a savings in the Chapter I program of $340,000, which could be used to hire 12 additional teachers or 20 teacher's aides. Based upon Dr. Sellers's recommendation, the Board, on June 12, 1995, voted unanimously to abolish the central office staff positions, including Morse's, and to adopt a school-based program. The Board also voted on that same day to accept the resignation of Dr. Marsha Khoury as the director of elementary education.
On June 13, 1995, Dr. Sellers met with Morse and two other displaced supervisors to discuss the opening created by Dr. Khoury's resignation, giving each a copy of the Board's reduction-in-force policy and a job description for the recently vacated position. Dr. Sellers, along with three other central office personnel, interviewed Morse and the two other displaced supervisors on June 19, 1995, for the position of director of elementary education. After the interviews, the interviewers privately ranked each supervisor. Each interviewer ranked Dr. Barbara Spencer first; therefore, Dr. Sellers recommended to the Board that Dr. Spencer fill the vacant position. Morse told Dr. Sellers again that she would not go back to the classroom as a teacher. On June 22, 1995, the Board accepted Dr. Sellers's recommendation that Dr. Spencer be appointed as director of elementary education.
On June 23, 1995, Dr. Sellers wrote Morse a letter explaining that Dr. Spencer had been recommended for the position of director of elementary education; that all remaining displaced Chapter I employees had been placed, except for Morse; that there were no other supervisory positions available for which Morse was certified and qualified; that based on Board policy Morse was entitled to fill a teacher's position; that Morse had to notify Dr. Sellers of her decision, in writing, before the Board's scheduled July 14, 1995, meeting; and that Dr. Sellers would have to recommend to the Board the cancellation of Morse's employment contract if she failed to accept a teacher's position. Morse did not respond to Dr. Sellers's letter.
At the hearing on July 14, 1995, Dr. Sellers recommended to the Board that a hearing be held to consider the cancellation of Morse's employment contract. On July 17, 1995, Dr. Sellers notified Morse by letter that the Board would hold a hearing on August 17, 1995, to consider the cancellation of her employment contract. The letter stated the reasons for the proposed cancellation of Morse's contract, in part, as follows:
 "1. There has been a justifiable decrease in the number of administrative/supervisory positions in the Central Office pertaining to the Chapter I/Title I program which includes your position. There are no other administrative/supervisory positions which are either vacant or occupied by a non-tenured employee at this time and for which you are qualified and certified. *Page 412 
On application of the Board's reduction-in-force policy, and based upon your qualifications and certification, you were offered a position of elementary teacher or Title I teacher in any of the Board's qualified schools. You failed, refused and/or declined to accept any of these positions."
Morse advised the Board that she intended to contest the proposed cancellation of her employment contract; the Board voted unanimously to cancel Morse's employment contract.
We initially note that a tenured teacher's contract may be canceled for incompetency, insubordination, neglect of duty, immorality, justifiable decrease in the number of teaching positions, or other good and just cause. § 16-24-8, Ala. Code 1975. Our supreme court has stated:
 "Pursuant to § 16-24-10, the action of the Commission is final and conclusive unless it fails to comply with the provisions of the chapter or is unjust. The scope of judicial review of a decision of the Commission is extremely limited — once the Commission makes a finding from the record, courts reviewing the Commission's decision must presume that the Commission's decision is correct, and that decision should not be reversed unless the overwhelming weight of the evidence indicates otherwise."
Ex parte Alabama State Tenure Commission, 657 So.2d 1122,1123-24 (Ala. 1994).
Morse first argues that the Board's action in canceling her contract was in violation of our supreme court's holding inEx parte Jackson, 625 So.2d 425 (Ala. 1992). Morse contends that notice to her of the proposed cancellation of her contract was not given until July 17, 1995 — well after the last day of the school term — and that, because, she says, the Board merely delayed taking action until after the end of school, the stated grounds for the proposed cancellation of her contract did not fall within the "new grounds" exception under Ex parteJackson.
At issue in Ex parte Jackson was the appropriate statutory construction of § 16-24-12, Ala. Code 1975. Section 16-24-12, states, in part:
 "Any teacher in the public schools, whether in continuing service status or not, shall be deemed offered reemployment for the succeeding school year at the same salary unless the employing board of education shall cause notice in writing to be given said teacher on or before the last day of the term of the school in which the teacher is employed. . . ."
Our supreme court construed the statute as written and held that where a proposal to cancel a teacher's contract predates the end of the school term, § 16-24-12 requires that notice of the proposed cancellation be given to the teacher before the end of the term. Ex parte Jackson, supra. Our supreme court stated:
 "[W]e emphasize that the result we reach today should not be read to preclude the cancellation of a tenured teacher's contract during the summer if new grounds for cancellation arise after the end of the school term. Moreover, where such new grounds arise, the school board, in considering a cancellation proposal, shall not be limited in its consideration to alleged acts of malfeasance or nonfeasance occurring during the summer, but may consider such acts in light of the teacher's performance throughout that teacher's career. We hold only that where, as here, the school board's proposal to cancel a teacher's contract predates the end of the school term, § 16-24-12 requires that tenured teachers, like their nontenured counterparts, be notified of the decision before the end of the term."
Id., at 430 (emphasis in original).
We conclude that the Board's action did not violate our supreme court's holding in Ex parte Jackson, because the proposal to cancel Morse's contract did not predate the end of the school term. The record indicates that the grounds given for the proposed cancellation of Morse's contract were two-fold: (1) a justifiable decrease in the number of supervisory positions that resulted in Morse's position with the Board being abolished; and (2) Morse's failure to accept a teaching position with the Board before the Board's July 14, 1995, meeting. The decrease in supervisory positions and the abolition of Morse's position *Page 413 
were the result of changes made in Washington in the Chapter I program — mainly, the move to a school-based decision-making concept. On May 16, 1995, Dr. Sellers had informed the central office staff that the Board was planning on moving to a school-based program, but that the end result of such a move was uncertain. She also gave Morse a letter informing her that it appeared that her position in the central office would be abolished; however, it was not until June 12, 1995, that the Board voted to accept Dr. Sellers's recommendation to abolish Morse's position and to move to a school-based program. There was no cancellation, or proposed cancellation, of Morse's contract at this point; the Board had simply voted to abolish Morse's position. It was not until July 14, 1995, after Morse had failed to respond to Dr. Sellers's offer of a teaching position, that the proposal to cancel Morse's contract was made to the Board. Morse was notified of the proposed cancellation of her contract on July 17, 1995. The abolition of Morse's position and her failure to respond to Dr. Sellers's offer of a teaching position before July 14, 1995, resulted in the proposed cancellation of her contract. These three events all occurred after May 24, 1995, the last day of the school term; therefore, the Board's action did not violate Ex parte Jackson.
Morse next seems to argue that she was denied due process, because, she says, she was not given notice of, or an opportunity to be heard at, the Board's June 12, 1995, meeting at which it voted to abolish the central office staff and to move to a school-based program. We find this argument to be without merit. The Teacher Tenure Act requires that a teacher be given notice, and, if he chooses, an opportunity to be heard, before cancellation of his contract. § 16-24-9, Ala. Code 1975. The Act does not require additional notice and an opportunity to be heard when an employing board makes decisions to restructure its programs. This court has held that the language of this statute clearly contemplates due process.Jeter v. Alabama State Tenure Commission, 473 So.2d 513
(Ala.Civ.App. 1985).
After carefully reviewing the evidence, we cannot say that the Commission's affirmance of the Board's cancellation of Morse's contract was contrary to the overwhelming weight of the evidence.
AFFIRMED.
ROBERTSON, P.J., and MONROE, CRAWLEY, and THOMPSON, JJ., concur.