THOMAS, Judge.
Cedrick Webb, a tenured teacher, taught physical education and served as the head football coach at Bellingrath Junior High School (“Bellingrath”) in Montgomery County. On May 4, 2006, three weeks before the end of the 2005-2006 school term, Webb was placed on administrative leave, with full pay and no loss of benefits, while Dr. Angela Mangum, the Bellingrath principal, and Jimmy Barker, the assistant superintendent for human resources at the Montgomery County Board of Education (“the Board”), investigated an incident that had occurred at school the day before, May 3, 2006, involving Webb and a seventh-grade student.
On January 26, 2007, Linda Robinson, the Board’s secretary and interim superintendent, wrote Webb a letter informing him that she intended to recommend that the Board cancel his teaching contract on the grounds of insubordination, neglect of duty, failure to perform his duties in a satisfactory manner, and other good and just cause, as provided in § 16-24-8, Ala. Code 1975. Specifically, Robinson’s letter stated that she proposed that Webb’s contract be canceled for the following misconduct that the Board referred to as “Charge I”:
“On May 3, 2006, you used and directed profane, abusive, and degrading language toward a student and further used the same language in the presence of other students and a staff member; you also assaulted a student by intentionally tossing a liquid substance on the person of the student from a cup out of which you had been drinking.”
In what the Board referred to as “Charge II,” Robinson’s letter listed 11 previous disciplinary actions that had been taken against Webb in the period between January 2002 and February 2006 that, Robinson said, “provide[d] additional supporting grounds for the recommendation to cancel [Webb’s] contract as a teacher.” The letter set out the previous disciplinary actions as follows:
“1. You violated Board Policy in that you failed to report on February 8, 2006, that a student at Bellingrath Jr. High School broke his leg while in your care during fifth period. You received a written reprimand.
“2. You violated Board Policy in that you refused to grant students access to your classroom on November 29, 2005, and December 1, 2005, at Bellingrath Jr. High School. You received a written reprimand.
“3. On or about October 10, 2005, you used and directed profane, degrading and unprofessional language toward a student and made improper physical *99 contact with the same student at Bellin-grath Jr. High School. You also conducted a conference with the parent of the student and used profane and unprofessional language during the conference. You received a written reprimand, a 10-day suspension without pay and were required to attend an anger management workshop.
“4. On May 11, 2005, you used and directed profane, degrading and unprofessional language toward a student and used the same language in the presence of other students at Bellingrath Jr. High School. You received a written reprimand and a [5]-day suspension.
“5. On numerous occasions between October 1, 2004, and December 7, 2004, you used and directed profane, degrading and unprofessional language toward several students and were physically aggressive toward several students at Bel-lingrath Jr. High School. You received a written reprimand.
“6. On December 3, 2004, you left students under your care unattended and unsupervised at Bellingrath Jr. High School. You received a written reprimand.
“7. On numerous occasions between April 1, 2004, and April 4, 2006, you failed and refused to perform the following duties: a) post attendance records; b) complete Failure Reports; c) complete lesson plans; d) attend a required function for teachers; e) sign-in as required; f) you also left the school campus without permission; and, g) you filed a false Failure Report.
“8. On February 25, 2002, you failed to follow a directive of your supervisor at Thelma Smiley Morris Elementary School who directed you to ask the drivers of two parked cars to move the cars from the bus lane. In response to the directive you responded to your supervisor in a loud, disrespectful and unprofessional manner and walked away without complying with the directive. You received a written reprimand.
“9. On February 26, 2002, you left students in your care unattended and unsupervised at Thelma Smiley Morris Elementary School. Two of the students got into a fight. You responded to your supervisor’s inquiry about the unsupervised students in a loud, disrespectful and unprofessional manner. You received a written reprimand.
“10. On January 25, 2002, you failed to follow directives as provided in the Thelma Smiley Morris Elementary School Faculty Handbook, ‘Daily Routine # 9,’ when you were observed by your supervisor entering the building through a side door which is unauthorized for teachers to enter or exit. You received a written reprimand.
“11. On January 23, 2002, your supervisor called you as you were leaving the office at Thelma Smiley Morris Elementary School for the purpose of asking you a question. You responded to your supervisor in a loud, disrespectful and unprofessional manner. You received a written reprimand.”
On February 20, 2007, the Board voted to cancel Webb’s employment contract. Webb filed a timely contest of the Board’s decision, after which a hearing officer was selected pursuant to § 16-24-20(b), Ala. Code 1975. The hearing officer conducted a three-day hearing on July 25-27, 2007.
At the outset of the proceedings, Webb moved for a judgment as a matter of law, contending that the Board was prohibited from making the May 3, 2006, incident at Bellingrath a basis for canceling his teaching contract because, he said, the Board had failed to notify him of the proposed cancellation before the 2005-2006 school term ended, as, he alleged, § 16-24-12, *100 Ala.Code 1975, requires. The hearing officer agreed with Webb’s argument and concluded that the Board’s proposal to make the May 3, 2006, incident a basis for canceling Webb’s employment contract was legally impermissible because the Board’s cancellation notice to Webb had been untimely.
The Board filed a motion in limine, arguing that Webb was not entitled to call witnesses and present documentary evidence in an attempt to “relitigate” his 11 previous disciplinary actions during the hearing. The hearing officer denied the Board’s motion, holding that Webb would be permitted to deny the factual basis for, or to assert a defense to, the previous disciplinary actions by calling witnesses and submitting documentary evidence in support of his position.
In order to prove the misconduct alleged as Charge I, the Board presented the testimony of Dr. Mangum, the principal of Bellingrath; two seventh grade students at Bellingrath; and James Wright, another teacher and coach at Bellingrath. The evidence with respect to Charge I tended to show the following: On May 3, 2006, during a physical-education class, Webb heard that two male students, A and B, had been throwing rocks at a third student. Webb called the students over to him and asked the retract officer, Wright, to hold the students in retract until the end of the class period.[1] Student B admitted that they had been throwing rocks. Student A protested, claiming that he had done nothing wrong, whereupon Webb advised Wright to watch student A because “he will try you.” Student A approached Webb, and Webb said, “Just don’t get in my personal space.” The student continued towards Webb with a threatening posture, and Webb repeated, “Just don’t get in my personal space.” The student replied, “What, I ain’t scared of you and I don’t like you, anyway,” or words to that effect. Webb testified that he took a sip of liquid from a cup, removed the lid from the cup, and tossed the liquid out, saying to the student, “This is what I think about that.” Webb said that he tossed the liquid in the direction of the student and slightly to the student’s side, but not on the student. Student A stated that Webb said, “This is what I think of you, m f_,” and tossed the liquid directly at him, soaking his pants below the knee. Student A called out to Wright, saying “[Y]ou see Coach Webb done throwed that water on me,” before running to the principal’s office, along with student B, and reporting to Dr. Mangum what had occurred. Dr. Mangum took statements from student A, student B, and Wright.
Student B’s statement differed from student A’s statement in that student B reported that, before Webb tossed the liquid, Webb said to student A, “I don’t give a f_,” and that then, as Webb tossed the liquid, Webb said to student A, “This is what I think about you.” Wright’s statement reported that Webb tossed the liquid in the direction of student A and said, “This is what I think about it.”
Webb went to the office to explain the altercation to Dr. Mangum, but the bell signaling the next class rang and Webb decided to return to his class. He returned to the office after school, however, told Dr. Mangum that he had something to discuss with her, and, according to Webb, she replied, “There is nothing to discuss.” Webb wrote out a statement describing the incident, placed it in the principal’s box in the office, and left.
Wright testified at the hearing that there were about seven drops of liquid on *101 student A’s pants and shoes. Dr. Mangum testified that the student’s pants were soaked. Dr. Mangum stated that she talked with both students when they first came to the office to report the incident. She also talked with Wright. Later, she asked all three individuals to write out statements describing the incident. She said that, in her discussion with Wright, Wright had said that Webb used the term “m_f_” in speaking to student A, but in Wright’s written statement there was no reference to that term. Dr. Man-gum asked Wright about the discrepancy, stating that she had understood him to say that Webb had used the term “m_f_” and inquiring whether Webb had, in fact, used that term. Wright answered, “Well, it could be,” explaining that he had heard the term but that both student A and Webb had been talking at the same time and he could not be sure exactly who said what.
In order to prove the misconduct alleged as Charge II, subparagraphs 1-11, the Board presented the testimony of the two school principals who had been Webb’s supervisors during the relevant periods, as well as the testimony of Board assistant superintendent Barker. Dr. Mangum, the principal at Bellingrath from 2004 through 2006, described her role in and investigation of the incidents set out as Charge II, subparagraphs 1-7, and she authenticated documentary evidence pertaining to those incidents. Sophia Johnson, the principal at T.S. Morris Elementary School in Montgomery County, described her role in and investigation of the incidents set out as Charge II, subparagraphs 8-11, and she authenticated documentary evidence pertaining to those incidents. The Board did not present the testimony of witnesses to substantiate many of the facts that gave rise to the 11 previous disciplinary actions but, instead, relied on the authentication by the two principals of the documentary evidence contained in Webb’s personnel file.
At the hearing, Webb admitted the misconduct underlying what the Board called Charge II, subparagraph 3, and Charge II, subparagraph 11. For the other nine previous disciplinary actions, Webb either denied the misconduct attributed to him, asserted that the principal had been motivated by personal animus in. disciplining him, or claimed that other teachers had engaged in the same misconduct but had not been similarly disciplined.
On January 15, 2008, the hearing officer rendered a decision reversing the Board’s cancellation of Webb’s employment contract and reinstating Webb to his previous teaching position. The hearing officer determined that, although the May B, 2006, incident described as “Charge I” could not constitute a ground for canceling Webb’s teaching contract, it could trigger disciplinary action less severe than cancellation; accordingly, the hearing officer imposed upon Webb a 10-day suspension without pay for the misconduct described as “Charge I.”
The hearing officer entered findings of fact and conclusions of law with respect to the previous disciplinary actions listed as Charge II, subparagraphs 1-11. He ruled that because Webb had admitted the misconduct made the basis of 2 prior disciplinary actions — those described as Charge II, subparagraph 3, and Charge II, subpara-graph 11 — those charges would be upheld. The hearing officer concluded that because Webb had already received a 10-day suspension without pay for the incident described as Charge II, subparagraph 3, “no further penalty is warranted.” The hearing officer determined, however, that the conduct made the basis of the disciplinary action listed as Charge II, subparagraph 11, warranted a more severe penalty than *102 the written reprimand Webb had received in 2002; therefore, the hearing officer imposed a 10-day suspension as the appropriate penalty for the conduct made the basis of Charge II, subparagraph 11.
For the other nine previous disciplinary actions, the hearing officer held either (1) that Webb had presented evidence indicating that he was not guilty of the misconduct charged or (2) that Webb had been the victim of disparate discipline because other teachers who had engaged in the same misconduct had not been disciplined. Finally, the hearing officer ordered the Board to expunge those nine disciplinary actions from Webb’s personnel file.
This court agreed to hear the Board’s appeal with respect to the following issues that, the Board alleged, were “special and important reasons” for granting the appeal:
“[I.] The Hearing Officer erred when he ruled that the Board’s notice of cancellation was invalid because the Board did not notify [Webb] of the charges before the end of the 2005-2006 school year, where the violation which gave rise to the charges occurred three weeks pri- or to the end of the school year.
“[II.] The Hearing Officer erred when he reopened and litigated previously adjudicated disciplinary proceedings (not before him for adjudication) and substituted his judgment and disciplinary actions for that of the Board.
“[III.] The Hearing Officer erred and exceeded all bounds of his authority as provided in § 16-24-10(a) and § 16-24-20(c), Code of Alabama 1975, when he ordered the Board to remove from the personnel history of [Webb] nine (9) instances of employee misconduct and insubordination which were previously adjudicated, to include suspensions and written reprimands.”
This court also agreed to hear Webb’s cross-appeal, in which Webb argues that the hearing officer had no authority to impose upon him a greater punishment — a 10-day suspension without pay — for an incident that had taken place 5 years earlier than the punishment that had been imposed upon him at the time — a written reprimand. The Board concedes that Webb is entitled to prevail on the cross-appeal.

Standard of Review

Section 16-24-10(b), Ala.Code 1975, provides that “[t]he decision of the hearing officer shall be affirmed on appeal unless the Court of Civil Appeals finds the decision arbitrary and capricious, in which case the court may order that the parties conduct another hearing consistent with the procedures of this article.” “The Court of Civil Appeals [has] the authority to reverse the decision of the hearing officer for failing to follow the applicable law, because the failure to follow the applicable law renders the hearing officer’s decision arbitrary and capricious.” Ex parte Wilson, 984 So.2d 1161, 1170 (Ala.2007).

Webb’s Motion Challenging the Validity of the Board’s Cancellation Notice

The event that precipitated the Board’s decision to cancel Webb’s employment contract occurred on May 3, 2006, three weeks before the end of the 2005-2006 school term. On May 4, 2006, Webb was placed on administrative leave with full pay and benefits pending an investigation of the May 3 incident. Webb was formally notified on January 26, 2007, during the succeeding school term, that the Board proposed to cancel his teaching contract. Webb remained on administrative leave, receiving full pay and benefits, at the time of the hearing in this case, July 25-27, 2007.
*103 Relying on § 16-24-12, Ala.Code 1975, and Ex parte Jackson, 625 So.2d 425 (Ala.1992), the hearing officer concluded that the Board’s notice of cancellation was invalid because it had not been served on Webb before the end of the 2005-2006 school term. Section 16-24-12 provides, in pertinent part:
“Any teacher in the public schools, whether in continuing service status or not, shall be deemed offered reemployment for the succeeding school year at the same salary unless the employing board of education shall cause notice in writing to be given said teacher on or before the last day of the term of the school in which the teacher is employed; and such teacher shall be presumed to have accepted such employment unless he or she shall notify the employing board of education in writing to the contrary on or before the fifteenth day of June.”
In Ex parte Jackson, the Mobile County Board of School Commissioners adopted, on March 14,1990, a proposal to cancel the teaching contract of Lucy Jackson, a tenured teacher. The Board of Commissioners, however, did not notify Jackson of the proposed cancellation until August 1, 1990, two months after the end of the 1989-1990 school term. The Board of Commissioners voted to cancel Jackson’s contract on August 20, 1990, and the Alabama State Tenure Commission affirmed the Board of Commissioners’ decision. Jackson petitioned the Mobile Circuit Court to issue a writ of mandamus directing the Commission to set aside its order of cancellation. The circuit court denied the writ, and Jackson appealed to this court, which affirmed the circuit court’s judgment on the authority of State ex rel. Steele v. Board of Education of Fairfield, 252 Ala. 254, 40 So.2d 689 (1949) (holding that § 16-24-12 is inapplicable to tenured teachers). See Jackson v. Alabama State Tenure Comm’n, 625 So.2d 425 (Ala.Civ.App.1991).
The Alabama Supreme Court granted certiorari review, overruled Fairfield, decided that § 16-24-12 applies to both tenured and nontenured teachers, and reversed the judgment of this court, stating:
“We hold only that where, as here, the school board’s proposal to cancel a teacher’s contract predates the end of the school term, § 16-24-12 requires that tenured teachers, like their nontenured counterparts, be notified of the decision before the end of the term.”
Ex parte Jackson, 625 So.2d at 430 (emphasis added). As the emphasized portion of the quote from Ex parte Jackson indicates, the supreme court’s holding in that case is inapplicable to this case because the Board’s proposal to cancel Webb’s contract did not predate the end of the 2005-2006 school term. See also Morse v. Alabama State Tenure Comm’n, 705 So.2d 410, 412 (Ala.Civ.App.1997) (stating that “the Board’s action did not violate our supreme court’s holding in Ex parte Jackson, because the proposal to cancel Morse’s contract did not predate the end of the school term”).
In the present case, the hearing officer accepted Webb’s argument that Ex parte Jackson stands for the proposition that a school board cannot cancel a tenured teacher’s contract for misconduct that occurred in one school term unless it serves the teacher with notice of cancellation before the end of that school term. The hearing officer erred in reading Ex parte Jackson so broadly. Our supreme court clearly stated that Ex parte Jackson is limited to those situations in which a “school board’s proposal to cancel a teacher’s contract predates the end of the school term,” 625 So.2d at 430, but its notice to the teacher comes after the end of the school term.
The incident that formed the basis for the Board’s decision to cancel Webb’s eon- *104 tract occurred only three weeks before the end of the 2005-2006 school term and was still being investigated as that term ended. Accordingly, at the end of the 2005-2006 term, the Board had not yet made a decision regarding the cancellation of Webb’s teaching contract. That fact alone means that this case is not controlled by Ex parte Jackson.
“[W]ritten proof of contract non-renewal by the school board gives the teacher unequivocal notification that he will need to secure other employment after the school term ends.” Johnson v. Selma Bd. of Educ., 356 So.2d 649, 651 (Ala.1978). The end-of-the-school-term notice requirement in § 16-24-12 acknowledges the practical reality that “the interim between school terms — during which most teaching positions are filled — is a crucial period for both the teacher and the school board,” Ex parte Jackson, 625 So.2d at 428. The notice requirement of § 16-24-12 is based on the likelihood that a teacher who is “given notice only a day or two before the [succeeding] school term begins” will not be able to secure other employment in the teaching field. Estill v. Alabama State Tenure Comm’n, 650 So.2d 890, 892 (Ala.Civ.App.1994) (emphasis omitted). In this case, the Board apparently recognized that Webb’s ability to seek other employment for the succeeding school term could be compromised if, after the 2005-2006 school term ended, it decided to cancel his contract and notified him of that decision. The Board, therefore, placed Webb on indefinite administrative leave with full pay and benefits — thereby maintaining the status quo — until it could reach a decision regarding Webb’s continued employment.

The Board’s Motion Seeking to Prevent the Relitigation of Webb’s Previous Disciplinary Actions

The Board contends that the hearing officer exceeded the authority granted to him in § 16-24-20(c), Ala.Code 1975, by allowing Webb to reopen and relitigate 11 previous disciplinary actions and by entering new findings of fact and conclusions of law with respect to each of the 11 incidents. Section 16-24-20(c) provides:
“During all hearings conducted before a hearing officer pursuant to this article, the hearing officer may consider the employment history of the teacher, including, but not limited to, matters occurring in previous years. Testimony and exhibits shall be admitted into evidence at the discretion of the hearing officer. The hearing officer shall also have the authority and discretion to exclude or limit unnecessary or cumulative evidence.”
Webb argues that, by characterizing his 11 previous disciplinary actions as subparts of “Charge II,” the Board placed those disciplinary actions “at issue” and was thereby required to prove, for each charge, the factual truth of its allegations and the propriety of the penalty imposed.
We cannot accept Webb’s argument that the Board’s use of the term “Charge II” in its notice to Webb, and the listing of 11 previous disciplinary actions under the term “Charge II,” means that the facts underlying those disciplinary actions were “at issue” in the hearing — if “at issue” implies that, like separate counts in an indictment, the facts underlying the prior disciplinary actions stood as naked allegations without any probative value until the Board proved their truth at the hearing. We do not believe that is what the legislature had in mind when it provided, in § 16-24-20(c), that “the hearing officer may consider the employment history of the teacher, including, but not limited to, matters occurring in previous years.” Instead, we think that the legislature in *105 tended that a teacher’s employment history, if considered at all by a hearing officer, be regarded as just that — past history, or historical fact — and, therefore, not open to a trial de novo, but available to be weighed either in support of or in mitigation of the penalty imposed by the Board.
We find support for our holding — that a teacher’s employment history may be weighed as a factor either supporting or mitigating the penalty imposed by the Board — in the Alabama Supreme Court’s decision in Ex parte Dunn, 962 So.2d 814 (Ala.2007). In Ex parte Dunn, the hearing officer determined that a teacher had been guilty of serious and egregious misconduct. In deciding whether the cancellation of the teacher’s contract was the appropriate penalty, however, the hearing officer decided that the teacher’s exemplary and unblemished employment record was a mitigating factor that made cancellation of his contract too severe a penalty. This court reversed, holding that the hearing officer’s findings as to the severity of the teacher’s misconduct were so inconsistent with his conclusion that canceling the teacher’s contract was not the appropriate penalty as to make the hearing officer’s decision arbitrary and capricious. Board of Sch. Comm’rs of Mobile County v. Dunn, 962 So.2d 805 (Ala.Civ.App.2006). The supreme court reversed, holding that this court had improperly substituted its judgment for that of the hearing officer. Quoting from that portion of the hearing officer’s decision that explained how, and for what purpose, he had viewed the teacher’s employment history, the court stated:
“ ‘The Alabama Teacher Tenure Act permits the Hearing Officer to consider more than just the act of misconduct. Section 16-24-20(e) provides: “During all hearings conducted before a hearing officer pursuant to this article, the hearing officer may consider the employment history of the teacher, including, but not limited to, matters occurring in previous years.” ... Although not mandatory, the legislature clearly showed concern that a teacher’s otherwise good record could be considered.
“ ‘This type of evidence is of particular relevance under Section 16-24-10, which permits the hearing officer a fair amount of latitude when considering remedy or “actions,” as they are termed in this law, once making findings of fact and conclusions. It provides: “The hearing officer shall determine which of the following actions should be taken relative to the employee: Cancellation of the employment contract, a suspension of the employee, with or without pay, a reprimand, other disciplinary action, or no action against the employee.” ...
“ ‘This case thus comes down to whether cancellation of [the teacher’s] employment contract and his removal from this school district, which could effectively end his teaching ... career[ ], is the just and proper action in these circumstances. Given this Alabama law, several questions occur when consideration of the remedy is examined. First, whether the hearing officer should take into account [the teacher’s] employment history ...; if so, whether this evidence is sufficient to mitigate the termination decision. If such mitigation is considered and accepted, the final question is which “actions” or remedies under this Alabama law are best appropriate.’ ”
Ex parte Dunn, 962 So.2d at 821-22 (emphasis omitted; emphasis added). The supreme court concluded:
“In this case, the hearing officer’s decision clearly reflects his careful consideration of [the teacher’s] entire ‘employment history,’ including the good as well as the indefensible. Only after doing so did the experienced hearing officer de *106 termine what he considered to be the appropriate sanction for [the teacher’s] misconduct....
“... The Act allowed the hearing officer to consider the ‘mitigating factors’ evident in [the teacher’s] employment history. We will not second-guess his decision.”
Ex parte Dunn, 962 So.2d at 823-24 (emphasis added).
We conclude that when the legislature provided in § 16-24-20(c) that “[t]es-timony and exhibits shall be admitted into evidence at the discretion of the hearing officer,” it meant to give the hearing officer the discretion to consider testimony and documentary evidence indicating the basis for the previous disciplinary action against the teacher as well as any contemporaneous response or defense that the teacher made to the disciplinary action. We also conclude that the legislature intended that such evidence would normally be limited to the materials contained in the teacher’s personnel file. See § 16-22-14(b), Ala.Code 1975 (requiring city and county boards of education to establish and maintain a personnel file on each employee); § 16-22-14(c), Ala.Code 1975 (providing that “[t]he employee may answer or object in writing to any material in his or her file and the answer or objection shall be attached to the appropriate material”); § 16-22-14(e), Ala.Code 1975 (providing that “[statements, reports, and comments relating to work performance, disciplinary action against the employee, suspension of the employee, or dismissal of the employee shall be reduced to writing and signed by a person reasonably competent to know the facts or make a judgment as to the accuracy of the subject information. Additional information related to the written materials previously placed in the personnel file may be attached to the material to clarify or amplify them as needed.”); and § 16-22-14(g)(4), Ala.Code 1975 (providing that “[a]ny documents which may be lawfully contained in the personnel file of [a school-board] employee shall be made available to a lawfully authorized hearing officer or panel conducting an investigation into the competency or performance of the employee ....”).
Pursuant to the 2004 amendments to the Teacher Tenure Act, see Act. No. 2004-566, Ala. Acts 2004 (effective July 1, 2004), a tenured teacher is entitled to contest and have a hearing officer review, among other things, a “minor suspension,” i.e., a suspension without pay of seven days or less. See §§ 16-24-17 through -19, Ala.Code 1975. Section 16-24-19 provides that review of a minor suspension by the hearing officer proceeds as follows:
“[T]he parties shall submit to the hearing officer, with a copy to the opposing party, evidence, information, and/or other documents supportive of, or in contravention to, the action... .[T]he parties shall submit written briefs on the factual and legal issues relevant to the action. The hearing officer shall consider the case on the written submissions. The hearing officer shall determine whether the evidence was sufficient for the board to take the action and shall render a written decision, with findings of fact and conclusions of law, within 30 days after the deadline for submission of materials. The decision of the hearing officer shall be final.”
If the legislature determined that a teacher is not entitled to a full-fledged trial for a cmrent contested minor suspension but is, instead, entitled to have a hearing officer review the matter only on “written submissions” of the parties, we cannot imagine that the legislature intended to provide, in § 16-24-20(e), for a trial de novo of past disciplinary actions.
*107 We hold that § 16-24-20(c) does not authorize a trial de novo of a teacher’s previous disciplinary actions. Nor does it allow a teacher to offer an explanation of or to assert a defense to a previous disciplinary action that, the record demonstrates, the teacher did not offer or assert at the time he or she was originally disciplined. Our view that § 16 — 24—20(c) authorizes the hearing officer to consider a teacher’s previous disciplinary actions as a matter of historical fact, tempered only by the hearing officer’s ability to consider any contemporaneous response or defense that the teacher originally asserted to the disciplinary action, is rooted in considerations of fundamental fairness and quasi-judicial/administrative economy. We do not accept the Board’s argument that principles of collateral estoppel would prevent a teacher from attacking his previous disciplinary actions. Nevertheless, we believe that basic notions of fundamental fairness counsel against permitting a teacher to mount a challenge to a previous disciplinary action that had been resolved months or years earlier if the teacher did not challenge the discipline at the time it was imposed, or if he or she originally challenged the discipline on a ground other than the ground he or she proposes to assert to the hearing officer. Any other procedure would inevitably result in the situation that has presented itself in this case — a lengthy and protracted hearing and a voluminous administrative record filled with evidence that, if relevant at all, could have and should have been raised by the teacher at the time the previous disciplinary action was imposed.
The record indicates that for most of the previous disciplinary actions listed as Charge II, subparagraphs 1-11, Webb failed to respond or to assert a defense to the discipline at the time it was imposed. We begin with the earliest of Webb’s previous disciplinary actions, those imposed upon Webb in 2002 by Principal Sophia Johnson at T.S. Morris Elementary School, and work forward to the most recent disciplinary actions, those imposed upon Webb between 2004 and 2006 by Principal Angela Mangum at Bellingrath.
Charge II, subparagraph 11: Webb admitted that he had answered Johnson by saying, ‘To.” He received a written reprimand. The hearing officer made the following finding:
“Webb’s admission to using To’ to answer Johnson and [his statement] that he did not mean the comeback as disrespectful does not hold. The fact that the Principal must maintain the respect of the staff and students of the school could be seriously undermined by such a response. Therefore, this charge is upheld. Webb disrespected Johnson ... and is hereby ordered to a ten (10) day suspension without pay.”
The Board concedes, and we hold, that the hearing officer erred by imposing on Webb a greater penalty than he had received in 2002. Nothing in the Teacher Tenure Act gives a hearing officer the authority to increase the punishment that was imposed upon a teacher in a prior disciplinary action.
Charge II, subparagraph 10: At the hearing, Webb denied that he had entered the T.S. Morris Elementary School building through a side door that teachers were not authorized to use. He also presented evidence indicating that other teachers had entered through the side door and had not been disciplined. The record clearly demonstrates that Webb did not respond or otherwise defend against this charge at the time it was made in 2002. On cross-examination of Webb by the Board’s attorney, the following occurred:
“Q. Now, you heard [Johnson] testify that she saw you. And first of all, *108 she testified that you saw her; you looked at her coming in; is that correct?
“A. No, sir.
“Q. So, you’re saying you were not there; she didn’t see you?
“A. She was not there.
“Q. She was not there?
“A. No, sir.
“Q. Did you ever write her back and tell her that you’re incorrect, that I came in through the front door?
“A. No, sir.
“Q. Did you ever tell her that she just was mistaken about this?
“A. No, sir.
“Q. And when she gave you this reprimand, she also gave you an opportunity to respond, didn’t she?
“A. Yes, sir.
“Q. But you didn’t respond?
“A. No.
“Q. You just received the reprimand and just at that time didn’t accept an opportunity to try to respond—
“A. Yes.
“Q. —and testify to today what you did back then?
“A. Right.
“Q. So you’re saying what you’re saying today is what happened, even though you didn’t respond back then?
“A. Correct.
“Q. And you just received this reprimand, and you knew that it was going to be in your personnel file?
“A. I didn’t know but—
“Q. Well, [the reprimand letter from the principal] says that it was going to be in your personnel file.
“A. But we had talked with [Board assistant superintendent] Mr. Barker, and it wasn’t supposed to go into my file.
“Q. Well, this letter says it was going into your personnel file.
“A. Yes, sir.
[[Image here]]
“Q. Okay. Did you put anything in writing to Mr. Barker?
“A. I didn’t.
“Q. Did you tell Mr. Barker that [you] didn’t do this?
“A. Yes, I did.
“Q. Why didn’t you follow it up with something in writing?
“A. I’ve never been in trouble with the law, so this is all new to me, really.
“Q. Well, being new, you’re saying you were not aware of the procedure?
“A. I am not aware of the procedure, no, sir.
“Q. Well, you know how to read, though, don’t you?
“A. Correct.
“Q. And you read [that you had the right to respond] in [the principal’s] letter?
“A. Correct.
“Q. And you understood that you could have responded?
“A. Yes.
“Q. And you didn’t.
“A. I didn’t.”
The hearing officer erred by allowing Webb to assert at the hearing defenses to the disciplinary action made the subject of Charge II, subparagraph 10, that he did not assert when the previous disciplinary action was imposed upon him. The hearing officer also erred by ordering the Board to expunge the disciplinary action from Webb’s personnel file.
Charge II, subparagraph 9: Webb admitted that he had failed to respond to the *109 principal’s reprimand letter concerning his having left students unsupervised on February 26, 2002. The hearing officer, therefore, erred by allowing Webb to assert a defense to Charge II, subparagraph 9, and erred by ordering the Board to expunge the disciplinary action from Webb’s personnel file.
Charge II, subparagraph 8: At the hearing, Webb denied that he had failed to follow Johnson’s directive to have cars in the bus lane moved and denied that he had responded to Johnson in a loud, disrespectful, and unprofessional manner. Webb testified that Johnson had spoken to him in a shrill and demeaning manner. Webb also presented a parent witness who corroborated his version of the events on February 25, 2002. On cross-examination, Webb acknowledged that he had received a reprimand letter from Johnson stating the charges against him and informing him that he had a right to respond. He admitted that he had “never responded.” The hearing officer, therefore, erred by allowing Webb to present evidence with respect to Charge II, subparagraph 8, at the hearing and erred by ordering the Board to expunge the disciplinary action from Webb’s personnel file.
Charge II, subparagraph 7: Webb testified that Dr. Mangum’s memorandums to him indicating that he had failed to post attendance records, to complete failure reports, and to complete lesson plans were “reminders,” not reprimands, so he did not respond to them. At the hearing, Webb’s defense to the charge that he had failed to satisfy the recording and posting requirements was that five physical-education teachers shared the same computer on which the records were required to be reported, that sometimes the computer was “down,” and that other teachers who had failed to file timely reports had not been disciplined. To that end, Webb introduced a folder six inches thick containing other teachers’ lesson plans and the dates they had been submitted.
With respect to the foregoing charges, the hearing officer found:
“Webb testified that he had never willfully submitted his attendance and lesson plans late. Defense witnesses corroborated Webb’s testimony that the gymnasium computer was overworked and was out of order regularly. Webb was the only Physical Education Teacher disciplined for this infraction. A total of five (5) [physical-education] teachers were all turning in the attendance and lesson plans late, and Webb was the only teacher disciplined. Another example of disparate discipline. This charge is de- • nied.”
The Board introduced a computer printout indicating that Webb had many students who were failing but that Webb had filed a report stating that he had “no failures.” Webb responded in writing to the charge that he had filed a false failure report, explaining that, at the time the failure reports were due, his grade book indicated that he had no students failing but that he had not had time to input the grades into the computer. The record demonstrates that Webb requested and was given an extension for filing his failure report but that he failed to meet the extended deadline.
With respect to the remaining misconduct outlined in Charge II, subparagraph 7, misconduct for which Dr. Mangum sent Webb a “Letter of Concern” — that Webb had failed to attend a Friday-night function for teachers, to sign in as required, and to obtain permission before leaving campus — Webb testified that he had informed Dr. Mangum that he had a second job on Friday nights, that he had never failed to sign in, and that he did not know that he needed permission to leave the *110 campus during his planning period. The hearing officer made no findings with respect to those charges.
In determining how much weight to give to this previous disciplinary action in light of Webb’s overall employment history, the hearing officer was entitled to have considered Webb’s defense to the reprimand for filing a false failure report — the only misconduct listed in Charge II, subparagraph 7, for which the record demonstrates that Webb offered a contemporaneous defense. The hearing officer had no authority to order the Board to expunge the disciplinary action from Webb’s personnel file.
Charge II, subparagraph 6: Webb testified that he did not respond to the charge that he had left students in his care unattended and unsupervised on December 3, 2004, because, he said, he had never received a letter reprimanding him for that misconduct. Dr. Mangum testified that when she entered the gymnasium on December 3, 2004, Webb and Maurice Buck-hanna, another teacher and Coach at Bel-lingrath, were in the gymnasium office with the door almost completely closed and there was no way they could have been able to see the students sitting on the bleachers in the gymnasium. Dr. Mangum read a letter of reprimand at the hearing and stated that she had sent the letter to Webb.
At the hearing, Webb denied that students were left unattended and unsupervised. He explained that he was in the gymnasium office writing office referrals for two unruly students and that Buckhan-na was standing in the office doorway watching the other students seated on the bleachers in the gymnasium when Dr. Mangum walked into the gymnasium and inquired why no one was supervising the students in the gymnasium. Webb testified that Buckhanna was not disciplined.
The hearing officer made the following findings:
“Webb denied this charge and his testimony was corroborated by Buckhanna [on] direct examination. Buckhanna and Webb were both accomplishing the same task, both in the same room, and Webb received a reprimand while [Buckhanna] received no discipline. Both the students named in this charge cursed the coaches, and neither was disciplined.
“The fact that Buckhanna was present in the same room as Webb, testified under oath that this incident did not occur and Buckhanna was not disciplined shows a disparate discipline. The students who wrote statements against Webb cursed the coaches and neither of the students was disciplined. This charge is denied.”
The hearing officer’s findings do not mention Webb’s assertion that he never received Dr. Mangum’s letter of reprimand, but we conclude that the hearing officer would have been entitled to weigh that assertion in determining the gravity of this disciplinary action in light of Webb’s overall employment history. The hearing officer was not, however, authorized to order the Board to expunge the disciplinary action from Webb’s personnel file.
Charge II, subparagraph 5: During a 2-month period in the fall of 2004, Dr. Man-gum received 12 different student complaints alleging that Webb had used profane and degrading language in reference to students. The complaints stated, among other things, that Webb had called one student a “sissy” and another student a “n_” (a racial slur); that Webb had demanded that a student “get [his] a-out [of Webb’s class]” or “get the f_out of [Webb’s] face”; that Webb had asked a student to “hold on and let [him] cuss these m f_s out”; that Webb had told *111 a female student that she wore clothes that were “too tight,” that she was “trash,” and that she should “get her b_a_” out of his office.
Webb did not respond to the written reprimand he received from Dr. Mangum with respect to those complaints. Dr. Mangum wrote an administrative summary of the complaints and sent it to Barker at the Board’s office. In January 2005, Webb had a conference with Barker during which he denied making the objectionable statements and “offered explanations in defense” of the allegations. On February 18, 2005, Barker wrote the following letter to Webb:
“This letter comes as a follow-up to the conference held in my office on January 5, 2005, wherein we discussed matters of concern to your principal; as reported by students and parents of students who are assigned to your classes. Although you offered explanations in defense of allegations of your using profanity and demeaning language, as well as your being too physically aggressive with students, the sheer preponderance of numbers (12 different complaints) gives cause for concern from this office. The consistency of the complaints suggests that you have indeed crossed the line of professionalism in your interactions with these students.
‘You are hereby admonished to refrain from unprofessional acts in your future dealings with students during your continued employment with Montgomery Public Schools. Failure to do so may result in more serious job actions being recommended from this office. We must be ever mindful as public employees that we have the responsibility to remove even the slightest possibility of impropriety in our dealings with those who are entrusted to our care.”
At the hearing, Webb stated that all the student complainants were “discipline problems” and that many had been sent to detention or to the alternative school on multiple occasions. He maintained that the students had asserted baseless complaints against him in an attempt to evade punishment for causing discipline problems in Webb’s presence, and, ultimately, he said, none of the students were punished for their own misconduct after they complained to Dr. Mangum about Webb’s conduct. To establish that defense, Webb presented reams of documents detailing the disciplinary records of the 12 students. In addition, Webb claimed that Dr. Man-gum had failed to properly investigate the student complaints because, he said, Dr. Mangum had not interviewed other teachers who were present during the incidents in question and who could have substantiated Webb’s version of the incidents. Dr. Mangum testified that she did not know of any other teachers who had been present and who could have provided information with respect to the student complaints. Webb presented several adult witnesses who corroborated his testimony. The hearing officer found:
‘Webb denied all of the thirteen (13)[2] student statements written against him. Defense provided adult teachers as witnesses who corroborated Webb’s testimony. None of the students testified at this hearing. Based on the testimony, this charge is denied.”
Because Webb did not file a written response to the complaints lodged against him, this court cannot know what “explanations in defense of the allegations” Webb offered to Barker. We conclude that the hearing officer exceeded the limits of his *112 discretion by allowing Webb to mount an all-out attack on this previous disciplinary action by calling witnesses and presenting reams of documentary evidence at a hearing three years after the imposition of the disciplinary action. The hearing officer also erred by ordering the Board to expunge this disciplinary action from Webb’s personnel file.
Charge II, subparagraph I: Webb received a written reprimand and a 5-day suspension without pay based on a complaint by a female student that, on May 11, 2005, when the student reported to Webb that another student was bothering her, Webb told the female student to “bring [her] big, black a_up here.” When the female student approached Webb, he told her that she was “stanky” and needed to take a bath. Dr. Mangum testified that she investigated the complaint by interviewing three other students who were present during the incident, all of whom substantiated the complaint.
At the hearing, Webb denied that he had made the statements attributed to him. He testified that Howard Garner, another teacher and Coach at Bellingrath, had been present during the incident, and he stated that no one had asked for Garner’s version of the events. Webb said that the day after the incident he had a conversation with assistant superintendent Barker at the Board’s office, during which he told Barker that Dr. Mangum had not interviewed Garner, and he claimed that Garner would corroborate Webb’s story.
Garner testified at the hearing that he was present during the May 11, 2005 incident. He stated that Webb had instructed the female student to sit down, and that she became defiant, but that Webb did not curse her or speak to her in an unprofessional manner. Garner testified at the hearing that he thought it was odd that Dr. Mangum had never interviewed him about the incident.
At the hearing, Webb testified that he had decided it would “do no good” to write a written response to the charge of misconduct because, he believed, Dr. Mangum and Barker had already decided that he was guilty. On cross-examination of Webb by the Board’s attorney, the following occurred:
“A. [By Webb:] I have never responded because I’d rather be suspended any day than fired, and I didn’t know what was going on, really.
“Q. So this is another time when you were facing being fired, and you accepted a five-day suspension?
“A. Yes.
“Q. So you never wrote to anybody to tell them, look, I didn’t call her a ‘fat a_’ or I didn’t tell her to ‘bring her big black a_ here.’ You just accepted the suspension?
“A. Yes.”
The hearing officer made the following findings with respect to the disciplinary action listed as Charge II, subparagraph 4:
“Webb denied that any of the written statements were true, and denied that he used any profanity. His testimony was supported by Garner under direct examination. There were no Plaintiff witnesses called for examination for this charge. Based on the hearsay evidence, this charge is denied.”
For the 5-day suspension without pay that Webb received, Webb had not only the right to respond to the charges against him, but also the right to request a conference with the Board, see § 16-24-17, Ala. Code 1975, to have counsel present, to have a court reporter record any statement he might make to the Board at the conference, to contest his suspension, and to obtain review of the suspension by a *113 hearing officer, see § 16-24-18, Ala.Code 1975.
Webb not only failed to file any written response to the disciplinary complaint, but also failed to contest the disciplinary action or to request review by a hearing officer pursuant to §§ 16-24-17 and -18. Under the circumstances, the hearing officer erred by allowing Webb to assert a defense at the hearing. The hearing officer also erred by ordering the Board to expunge this disciplinary action from Webb’s personnel file.
Charge II, subparagraph 3: Webb admitted the misconduct that formed the basis for this disciplinary action. Webb telephoned the mother of a male student who was having problems with other students and requested that the mother come in for a conference to discuss her son’s problems. When she arrived, Webb said, “I called you up because I don’t want no b_s_ coming on me.” The mother reported Webb’s comment, and Webb received a 10-day suspension without pay and agreed to attend a workshop on “Managing Your Emotions Under Pressure.” On November 8, 2005, assistant superintendent Barker wrote Webb a reprimand letter stating that “[fjailure on your behalf to maintain exemplary professional conduct during your continued employment with the Montgomery Public Schools will result in a recommendation of termination of [your] contract from this office to the Superintendent.”
The hearing officer made the following finding:
“Webb admitted his guilt in this charge, as he did use a curse word to the student’s mother, received a ten (10) day suspension without pay, and attended an anger management class. However, there was no Plaintiff witness called for examination for this charge other than Barker. Barker’s testimony was speaking from his notes made during the interview of the mother. No evidence was submitted.
“As Webb has completed a ten (10) day suspension without pay, and attended the class, no further penalty is warranted.”
Charge II, subparagraph 2: Webb received a written reprimand for failing to allow tardy students access to his classroom until they had received a pass from the principal’s office, in violation of school-board policy. At the hearing, Webb testified that he thought he had been following the policy. He presented the testimony of three other teachers who stated that they understood the policy the same way. The hearing officer found:
“Three teachers corroborated that the procedure in place when Webb was reprimanded [was] that if the student was tardy to class, the teacher was not to allow the student into the classroom until that student brought the teacher a permission slip from the office. Webb did refuse entrance to the classroom to a tardy student, and Mangum brought the student to Webb’s classroom and instructed Webb to let the student remain without a permission slip.
“Per the testimony, Webb did not commit a breach of the policy and/or procedures and this charge is denied.”
The hearing officer erred in determining that Webb had not violated the policy. The record contains a copy of the Bellin-grath faculty handbook with the following tardy policy adopted by the Board:
“ 1st Offense Warning
2nd Offense Contact Parents
3rd Offense Parent Conference Letter
4th & Subsequent Offenses* Referral to Administrator
“ *A11 consequences must have been implemented and documented prior to referring a student to an administrator.”
*114 The hearing officer also erred in ordering the Board to expunge this disciplinary action from Webb’s personnel file.
Charge II, subparagraph 1: Webb was given a written reprimand for failing to report that a student had broken his leg in Webb’s fifth-period class. Dr. Mangum testified that the school policy requires a teacher to notify the principal’s office immediately if a student suffers a major injury, and, she said, Webb did not report the injury until the following day. Webb filed with both Dr. Mangum and assistant superintendent Barker a written response to the reprimand letter he received. Webb testified at trial that he had orally reported the injury the same day the student was hurt; he stated that he had also completed a form entitled “Personal Injury Report Notice” and placed the form in the principal’s box. Dr. Mangum claimed that she did not receive the form, so Webb filled out another form the following day.
The Bellingrath faculty handbook does not specify when a student’s injury must be reported. Therefore, the hearing officer correctly determined that Webb did not commit a breach of the policy. Although the hearing officer would have been authorized to disregard this disciplinary action in determining what weight to give to Webb’s overall employment history, he had no authority to order the Board to expunge the disciplinary action from Webb’s personnel file.

The Hearing Officer’s Disposition of Charge I

 The hearing officer first determined that Charge I — the May 3, 2006, incident in which Webb was alleged to have cursed a male student and tossed a liquid at him — could not constitute a basis for the cancellation of Webb’s teaching contract because, the hearing officer decided, the Board did not provide Webb with timely notice of its proposal to cancel his contract. As we have previously discussed, that determination was erroneous. The hearing officer next concluded that, although Charge I could not constitute a ground for canceling Webb’s teaching contract, it could constitute a basis for disciplinary action less severe than cancellation. Therefore, the hearing officer addressed the merits of Charge I and decided the disputed issues of fact with respect to Webb’s conduct on May 3, 2006, as § 16-24-10(a) authorizes a hearing officer to do.[3] The hearing officer made the following findings of fact:
“The fact that Webb did allow this student to cause him to lose his temper and toss the water in the direction of the student cannot be overlooked, and is punishable. Whether or not Webb actually cursed the student was not eonclu-sively[4] proven, and shall not hold as punishable....
“Webb did assault the student by throwing water in the general direction of the student. The [hearing officer] *115 believes that this act was out of frustration rather than malice.”
Finally, applying the law as set out in § 16-24-10(a)[5] to the facts, the hearing officer determined that the appropriate disciplinary action for the misconduct described in Charge I was a 10-day suspension without pay.
Because the hearing officer “denied,” or set aside, all but 2 of the 11 previous disciplinary actions and ordered that those disciplinary actions be expunged from Webb’s personnel file, it may be that the hearing officer did not consider that Webb’s employment history weighed heavily in determining the appropriate disciplinary action that should have been imposed with respect to Charge I. Therefore, because this court has reversed the hearing officer’s initial determination that Charge I cannot provide the basis for canceling Webb’s contract and holds that Charge I can trigger the cancellation of Webb’s employment contract, and because this court has reversed the hearing officer’s “denial” and expungement order with respect to 9 of the 11 previous disciplinary actions in Webb’s employment history, and because this court holds that all 11 of the previous disciplinary actions may be considered as factors bearing upon the appropriate disciplinary action that should be taken against Webb, we remand the cause to the hearing officer with instructions to reconsider the appropriate action that should be taken against Webb in light of the principles outlined in this opinion.

Summary

This court agreed to hear the Board’s appeal with respect to the following issues that, the Board alleged, were “special and important reasons” for granting the appeal:
“[I.] The Hearing Officer erred when he ruled that the Board’s notice of cancellation was invalid because the Board did not notify [Webb] of the charges before the end of the 2005-2006 school year, where the violation which gave rise to the charges occurred three weeks pri- or to the end of the school year.
“[II.] The Hearing Officer erred when he reopened and litigated previously adjudicated disciplinary proceedings (not before him for adjudication) and substituted his judgment and disciplinary actions for that of the Board.
“[III.] The Hearing Officer erred and exceeded all bounds of his authority as provided in § 16-24-10(a) and § 16-24-20(c), Code of Alabama 1975, when he ordered the Board to remove from the personnel history of [Webb] nine (9) instances of employee misconduct and insubordination which were previously adjudicated, to include suspensions and written reprimands.”
We also agreed to hear Webb’s cross-appeal, presenting the issue whether the hearing officer had the authority to impose upon Webb a greater punishment — a 10-day suspension without pay — for an incident that had taken place 5 years earlier than the punishment that had been imposed upon him at the time — a written reprimand. The Board conceded that Webb is entitled to prevail on the cross-appeal.
With respect to all three issues on which this court agreed to hear the Board’s appeal, and with respect to Webb’s cross- *116 appeal, we hold that the hearing officer’s rulings were erroneous. We reverse the hearing officer’s order directing that Webb be reinstated to his previous position and remand the cause with instructions to reconsider the appropriate action that should be taken against Webb in light of the principles outlined herein.
APPEAL-REVERSED AND REMANDED.
CROSS-APPEAL — REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN, J., concurs in the result, without writing.
MOORE, J., concurs in the result only, without writing.

. Retract is in-school student detention.

. Our review of the record indicates that there were only 12 complaints. We cannot account for the hearing officer’s notation that there were 13 complaints.

. Section 16-24-10(a) provides, in pertinent part, that "[t]he hearing officer shall conduct a de novo hearing and shall render a decision based on the evidence and/or information submitted to the hearing officer.” An administrative hearing officer is a finder of fact, see State Dep't of Human Res. v. Gibert, 681 So.2d 560, 562 (Ala.Civ.App.1995), and his or her decision with respect to disputed facts is entitled to deference. Id. See generally Ex parte Dunn, 962 So.2d 814 (Ala.2007).

. Although neither the sufficiency of the evidence nor the burden of proof was included among the special and important reasons upon which this court agreed to hear this appeal, we note that a fact need not be "conclusively” proven. We assume, however, that the hearing officer meant that the fact had not been proven to his reasonable satisfaction.

. Section 16-24-10(a) provides, in pertinent part:
"The hearing officer shall determine which of the following actions should be taken relative to the employee: Cancellation of the employment contract, a suspension of the employee, with or without pay, a reprimand, other disciplinary action, or no action against the employee.”